SDD:TAD/ABK
F.# 2015R00760

**16M124**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ERDAL KUYUMCU,

        Defendant.

- - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

AFFIDAVIT AND COMPLAINT IN
SUPPORT OF AN APPLICATION
FOR AN ARREST WARRANT

(T. 50, U.S.C. §§ 1701, 1702 and
1705; T. 31, C.F.R. §§ 560.203,
560.204, and 560.206)

    STEVEN JEFFERSON, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

    Upon information and belief, in or about and between January 2013 and February 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ERDAL KUYUMCU, together with others, did knowingly and willfully export, re-export, sell and supply, and attempt to export, re-export, sell and supply, goods, to wit: metallic powders composed of cobalt and nickel, directly or indirectly from the United States to Iran, without first obtaining the required export control license from the Office of Foreign Assets Control, in violation of Title 50, United States Code, Sections 1701, 1702, and 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.206; and Title 18, United States Code, Sections 3551 et seq.

The source of your deponent's information and the grounds for his belief are as follows:[1]

## BACKGROUND OF THE INVESTIGATIVE AGENCY AND AGENT

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2010. I am currently assigned to the FBI's Iranian Counterintelligence Squad in the New York Field Office. In connection with my official duties as a Special Agent, I investigate criminal violations of federal laws, including laws pertaining to the export of goods, technology, information, and services from the United States, which laws are regulated by the United States Departments of State, Commerce and Treasury. I have received training in the laws and regulations relating to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1707, and the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Parts 560.203, 560.204 and 560.206. Additionally, I have received training in, among other things, criminal investigative techniques, and I have participated in criminal investigations involving the illegal export of goods from the United States, in violation of the above-listed laws and regulations.

2. I have personally participated in this investigation. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement authorities involved in the criminal investigation; (c) interviews with witnesses; and (d) my review of other records, reports and publicly-available or "open source" information. I have also reviewed documents obtained pursuant to court-authorized search warrants, including emails. Where

---

[1] Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

## RELEVANT EXPORT CONTROL LAWS AND REGULATIONS

3. At all times relevant to the events described herein, IEEPA authorized the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. See 50 U.S.C. §§ 1701 and 1702.

4. On March 15, 1995, President William Jefferson Clinton issued Executive Order 12957, finding that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency to deal with the threat. Executive Order 12957, as expanded and continued by Executive Orders 12959 and 13059, was in effect at all times relevant to this affidavit.

5. Pursuant to the Executive Orders noted above, the United States Secretary of the Treasury, in consultation with the Secretary of State, promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, which were renamed the Iranian Transactions and Sanctions Regulations ("ITSR") in October 2012. The ITSR generally prohibit "United States persons"[2] from engaging in or attempting to engage in the export, re-export, sale, or supply, directly or indirectly, of any goods, technology, or services to Iran or

---

[2] "[T]he term United States person means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States." 31 C.F.R. § 560.314.

3

the Government of Iran without having first obtained a valid export license from the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").[3]

6. Specifically, the ITSR impose, among others, the following prohibitions:

> Section 560.204 – Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran – Except as otherwise authorized [by a license issued by OFAC] . . . the exportation, reexportation, sale, or supply, directly or indirectly, . . . by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale or supply of any goods technology, or services to a person in a third country undertaken with knowledge or reason to know that (a) [s]uch goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or (b) [s]uch goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran. 31 C.F.R. § 560.204.
>
> Section 560.206 – Prohibited trade-related transactions with Iran; goods, technology, or services – Except as otherwise authorized [by a license issued by OFAC] . . . no United States person, wherever located, may engage in any transaction or dealing in or related to . . . [g]oods, technology, or services for exportation, reexportation, sale or

---

[3] Based on my training and experience, I understand that although there has been some limited relief from U.S. sanctions due to the Joint Comprehensive Plan of Action ("JCPOA"), none of that relief has affected the prohibitions at issue here. Since Implementation Day occurred on January 16, 2016, the ITSR was only minimally affected. It is possible to obtain, on a case-by-case basis, licenses for the export to Iran of commercial aircraft, parts, and services for civilian end-users; the importation of Iranian-origin carpets and foodstuffs is authorized via general license from the Department of the Treasury; foreign entities that are owned or controlled by a U.S. person, which includes U.S. corporations, are be permitted, via a general license, to engage in certain transactions involving Iran that do not involve U.S. goods, U.S. services, or U.S. persons; and certain Iranian entities and individuals have been removed from OFAC's list of Specially Designated Nationals. Last, the U.S. has suspended certain so-called "secondary" economic and financial sanctions directed toward non-U.S. persons who were doing business with certain sectors of the Iranian economy.

supply, directly or indirectly, to Iran or the Government of Iran. . . . For the purposes of . . . this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing. 31 C.F.R. § 560.206.

Section 560.203 – Evasions; attempts – Any transaction by any United States person . . . that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited. 31 C.F.R. § 560.203.

7. Further, IEEPA, 50 U.S.C. § 1705, provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." A person convicted of willfully committing, attempting, or conspiring to commit, or aiding and abetting the commission of any "unlawful act described in [the ITSR] shall be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both."

## FACTS SUPPORTING PROBABLE CAUSE TO ARREST ERDAL KUYUMCU

8. In the context of violations of U.S. export-control laws and sanctions regimes, individuals and companies attempting to circumvent the current United States embargo against Iran will often export or cause to be exported goods to companies located in non-embargoed countries, such as Turkey, for transshipment to end-users in Iran. In my experience and the experience of law enforcement officers with whom I have worked, goods are shipped from the country of origin to Turkey, sometimes accompanied by certifications or representations that the end-user of that equipment is located in Turkey. After goods arrive in Turkey, they are often transshipped to Iran. This arrangement permits both the U.S. exporter and the true Iranian end-user to evade and avoid the various controls and sanctions limiting trade with Iran.

9. ERDAL KUYUMCU, a naturalized United States citizen of Turkish descent, is the chief executive officer of Global Metallurgy, LLC ("Global Metallurgy"), a company based in Woodside, New York. According to its website, Global Metallurgy "is specialized in special metal products" and its "main goal is offer the highest quality European and American Metal products for the engineers around the globe at the most competitive price." Global Metallurgy's website also states that "[c]ustomers around the globe are contacting us when they are challenged by unique requirements."

10. A review of lawfully-obtained documents and information, including emails sent by and received from accounts associated with KUYUMCU, Global Metallurgy, and others reveals that, on multiple occasions, KUYUMCU acted as an intermediary or broker for the procurement of metallic goods that were exported from the United States to Turkey and destined for Iran. As described below, the first such exportation occurred in or about March 2013, and the second occurred in or about July 2013.

A. The March 2013 Export of the Cobalt Compound to Iran

11. On or about January 28, 2013, an Iran-based procurement agent whose identity is known to the undersigned Affiant (the "Iranian Procurement Agent") sent an email to a representative of a metallurgical company based in Istanbul, Turkey (the "Turkish Company"), the identity of which is known to the undersigned Affiant. The Iranian Procurement Agent purported to represent a company based in Tehran, Iran ("Iranian Company #1"), the identity of which is known to the undersigned Affiant. In this January 28, 2013 email, the Iranian Procurement Agent wrote: "Dear [representative of Turkish Company], I trust you are doing well. With reference to our last meeting at Mr. [name redacted]'s office in Tehran, we would like you to give us the most competitive price of the

following item basis on CPT Tehran. – Sulzer Metco Thermal Spray Powder AMDRY 9954 Qty: 1500 kg  Soonest delivery time for first part (300 kg) is important for us."

12.     Based on my training, experience, discussions with other law enforcement agents, and review of open source information, I understand that AMDRY 9954 is the brand name of a thermal spray powder composed primarily of cobalt and nickel that is used to protect surfaces against the corrosive effects of oxidation and sulfidation at high temperatures. I am advised by the U.S. Department of Commerce that AMDRY 9954 can be used to coat gas turbine components, including turbine blades and shrouds and can be used in aerospace, missile production, and nuclear applications. The chemical makeup of AMDRY 9954 is CoNiCrAlY. Exporting this compound without a license to Iran is prohibited under 31 C.F.R. § 560. Throughout this Affidavit, CoNiCrAlY is referred to as the "Cobalt Compound," irrespective of its brand name.

13.     Lawfully-obtained emails from accounts associated with the Turkish Company show that the originally-planned supplier of the Cobalt Compound did not have enough inventory. Thereafter, the owner of the Turkish Company, whose identity is known to the undersigned Affiant ("Co-Conspirator #1"), began corresponding with KUYUMCU about obtaining the Cobalt Compound from the United States.[4] As described below, these

---

[4]     Based on a review of emails between KUYUMCU and Co-Conspirator #1, the two individuals had a longstanding business and personal relationship. From on or about and between February 3, 2013 to March 26, 2013, KUYUMCU appears to have been in Turkey and Germany. Travel records indicate that on February 3, 2013, KUYUMCU flew from John F. Kennedy International Airport ("JFK") to Ataturk Airport in Istanbul, Turkey. Travel records and lawfully obtained emails also indicate that KUYUMCU and Co-Conspirator #1 traveled together from Istanbul to Stuttgart, Germany on or about February 25, 2013 and from Istanbul to Cologne, Germany on or about March 11, 2013. KUYUMCU returned from Istanbul to the United States on or about March 26, 2013. Moreover, on or about March 20, 2013, Co-Conspirator #1 obtained a United States B1/B2 visa. In the visa

7

emails, which included coded language when referring to Iran and requests for fake end-users of the Cobalt Compound, demonstrate that KUYUMCU was aware that the Cobalt Compound he obtained from a U.S. supplier and shipped to the Turkish Company would be sent to Iran and that it was illegal to do so.

14. On or about February 15, 2013, Co-Conspirator #1 emailed KUYUMCU, stating, in relevant part, "Brother, good morning. I am flying out to the neighbor's for three days, Middle East. I will be back on Sunday. FYI."[5] KUYUMCU responded, in relevant part: "Good luck at the neighbor's. Have a good flight..." Based on my training, experience and knowledge of the investigation, including the fact that Turkey (where Co-Conspirator #1 is based and where KUYUMCU is from) shares a border with Iran, and other references to the term "neighbors" in correspondence between KUYUMCU and Co-Conspirator #1, I believe the term "neighbors" refers to Iran.[6]

---

application (submitted in February 2013), Co-Conspirator #1 stated that s/he would be staying in New York City from May 5, 2013 to May 12, 2013, and s/he listed KUYUMCU's residence address in Woodside, New York as the address where s/he would be staying. In addition, Co-Conspirator #1 listed KUYUMCU as his/her contact person in the United States, whom Co-Conspirator #1 described as a "business associate."

[5] The text of this email was translated from Turkish to English by a certified interpreter.

[6] For example, in an email dated April 10, 2014, from KUYUMCU to an employee of a different Turkish company, KUYUMCU explains that a shipment "was denied due to suspicions of it being the NEIGHBOR. I have a favor to ask, if there is a company that you are close with that uses a vacuum furnace, can you show them at the end user? Basically, we need to be able to show that there is a company in Turkey that can melt this down." This email was translated from Turkish to English by a certified interpreter. In an earlier email, dated January 28, 2014, from an employee of Global Metallurgy based in Turkey who was formerly employed by the Turkish Company, the employee indicated that "I would like to be in contact with you regarding the business opportunities in Iran." These emails also demonstrate KUYUMCU's knowledge that it was illegal to export items from the United States to Iran.

15. On or about February 18, 2013, a representative of an Ohio-based supplier of metal, ceramic and specialty powders (the "Ohio Company"), whose identity is known to the undersigned Affiant, emailed KUYUMCU "the powder quote that you requested," for 800 pounds of the Cobalt Compound. The brand name of the Cobalt Compound provided by the Ohio Company—PAC9950AM—was different from AMDRY 9954, the brand the Turkish Company originally indicated it could provide to Iranian Company #1. The Ohio Company representative noted that: "Our PAC9950AM is Gas Atomized and will be similar to AMDRY9954."

16. The next day, February 19, 2013, KUYUMCU sent an email to Co-Conspirator #1 containing a hyperlink to a website and two attachments that described product information concerning the Cobalt Compound. On February 20, 2013, KUYUMCU received an email from Co-Conspirator #1 forwarding an email from the Iranian Procurement Agent stating that the Cobalt Compound would "be used in" a "process for coating of Turbine blades." Two days later, on or about February 22, 2013, the Iranian Procurement Agent emailed the Turkish Company and stated, in substance and in part, "[W]e hereby confirm the order." The Turkish Company forwarded this email confirming the order to KUYUMCU on or about the same day.

17. After confirming the order, the Iranian Procurement Agent changed the order to 670 pounds of the Cobalt Compound. This change was due to confusion between the Iranian Procurement Agent and a representative of the Turkish Company about the quantity of the order due to the Turkish Company representative's use of pounds and the Iranian Procurement Agent's use of kilograms as the unit of measure. In a series of emails on February 23, 2013, the Iranian Procurement Agent asked the Turkish Company's

9

representative, in sum and substance, why s/he was referring to 800 pounds when the order was for 300 kilograms of the Cobalt Compound. The Turkish Company's representative responded that 800 pounds was equivalent to approximately 363 kilograms and that "US companies use ... pound [sic] for the weight." The Iranian Procurement Agent then changed the order to 670 pounds of the Cobalt Compound, explaining that "[o]ur order for 300kg .... So, please place the order for 670 lb (approx. 304 kg)."

18. On or about February 26, 2013, the Ohio Company emailed KUYUMCU an invoice (#48496) for the purchase of 670 pounds of the Cobalt Compound, totaling $22,679.50. The invoice included the following statement, "[T]hese commodities, technology or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to U.S. law is prohibited."

19. On or about March 4, 2013, KUYUMCU emailed the Turkish Company, including Co-Conspirator #1, an invoice from his company, Global Metallurgy, in the amount of $23,450.00 for 670 units of the Cobalt Compound.[7] The invoice included the same export restriction warning: "[T]hese commodities, technology or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to U.S. law is prohibited."

20. On or about March 6, 2013, the Turkish Company emailed KUYUMCU a receipt for an electronic wire transfer of funds totaling approximately $23,450.00. This wire transfer had been sent from the Turkish Company through a New York-based financial institution to a U.S.-based account maintained by KUYUMCU.

---

[7] Based on my training, experience and knowledge of the investigation and the metal export industry, the price difference of approximately $800 represents a commission to KUYUMCU for putting the deal together.

21.     On March 11, 2013, a representative of the Ohio Company sent KUYUMCU an email containing a revised invoice for the Cobalt Compound, "with better pricing that you requested." The revised invoice reflects a total price of $22,076.50 for 670 pounds of the Cobalt Compound, reflecting a discount of approximately $600.00.

22.     Lawfully-obtained bank records and emails show that KUYUMCU caused at least two checks, dated March 4, 2013 and March 12, 2013, for approximately $12,000.00 and $10,076.50, respectively, to be mailed from Woodside, New York to the Ohio Company. Both checks listed "invoice 48496" in the memo section. This invoice number corresponds with the revised invoice number sent by the Ohio Company to KUYUMCU on February 26, 2013, for the purchase of 670 pounds of the Cobalt Compound for $22,076.50. The total amount of the two checks that KUYUMCU caused to be mailed was $22,076.50.

23.     On or about March 8, 2013, the Ohio Company sent KUYUMCU an email asking KUYUMCU the name of the end-user for the above-described transaction involving the Cobalt Compound: "have you had a chance to . . . send me the name of the company who you are selling this material to?"

24.     Later that same day, KUYUMCU emailed Co-Conspirator #1 asking, "[B]rother, can you tell me the name of a company? A friend company with a website and one that uses this material would be great. I'd appreciate it if you could read the email below." Three days later, on March 11, 2013, KUYUMCU sent another email to Co-Conspirator #1, stating, in relevant part: "Please don't forget to give me the name of a company that can be used as the end user."

11

25. On March 11, 2013, Co-Conspirator #1 sent KUYUMCU the name of a company in Turkey. Based on my training and experience, and on the foregoing emails between KUYUMCU and Co-Conspirator #1, where KUYUMCU asks for the name of "a friend company with a website . . . that uses this material," and specifically directs Co-Conspirator #1 to the "email below" from the Ohio Company asking the name of the end-user company, KUYUMCU was asking Co-Conspirator #1 to fabricate end-user information using the name of a "friend[ly]" company whose name could be provided to the Ohio Company in an effort to conceal that the true end user of the Cobalt Compound was Iranian Company #1.

26. Thereafter, on or about April 16, 2013, KUYUMCU emailed Co-Conspirator #1, asking, in part, "[H]ave you heard anything from the neighbor? : )"[8]

27. On or about April 22, 2013, KUYUMCU asked Co-Conspirator #1, "Do you have any information from the neighbor on the powder? I am eagerly waiting[.]"

28. Neither KUYUMCU, the Ohio Company, the Turkish Company, nor Iranian Company #1, sought, nor was approved for, a required OFAC license to export the Cobalt Compound to Iran. Moreover, Electronic Export Information ("EEI") compiled for the foregoing export reflects that the Turkish Company was falsely represented to be the end-user of the Cobalt Compound.[9]

---

[8] Based on my training and experience, the colon followed by a close parenthesis in the above quote represents a smiley face.

[9] The DOC collects EEI, which is the electronic equivalent of export data collected on a Shipper's Export Declaration.

12

B. The July 2013 Export of the Cobalt Compound to Iran

29. On or about March 6, 2013, KUYUMCU received an email from Co-Conspirator #1 that contained a forwarded email from the Iranian Procurement Agent with the subject line "New Enquiry powder."

30. Thereafter, in a series of emails in March 2013, KUYUMCU communicated with the Ohio Company concerning the procurement of an additional amount of the Cobalt Compound.

31. On or about June 26, 2013, the Ohio Company provided KUYUMCU with an invoice (#49111) for 330 pounds of the Cobalt Compound. The invoice also included the following export restrictive statement, "[T]hese commodities, technology or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to U.S. law is prohibited."

32. On or about June 28, 2013, KUYUMCU caused $10,230.00 to be wire transferred through a New York-based financial institution to Ohio Company. The wire transfer paperwork references invoice #49111. Invoice #49111 is also referenced in the originator to beneficiary information (OBI) in the bank records associated with this wire transfer.

33. On or about July 3, 2013, KUYUMCU emailed the Turkish Company, including Co-Conspriator #1, an invoice from Global Metallurgy for 330 pounds of the Cobalt Compound. The invoice charged a total of $11,170.50 for 330 pounds of the Cobalt Compound at a cost of $33.85 per pound. The invoice also included the export restrictive statement, "[T]hese commodities, technology or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to U.S.

law is prohibited." The July 3, 2013 email also included an airway bill stating that the shipment contained 150 kilograms (which is roughly equivalent to 330 pounds) of "metal powder nickel/cobalt." The airway bill also indicated that the Cobalt Compound would be shipped from JFK to Istanbul. The shipper's name was provided as Global Metallurgy and the Turkish Company was listed as the consignee.

34. Neither KUYUMCU, the Ohio Company, the Turkish Company, nor Iranian Company #1, sought, nor was approved for, a required OFAC license to export the Cobalt Compound to Iran. Moreover, EEI compiled for the foregoing export reflects that the Turkish Company was falsely represented to be the end-user of the Cobalt Compound.

C. <u>Post-Shipment Verification</u>

35. Exporting the Cobalt Compound without a license to Iran is prohibited under Title 31, Code of Federal Regulations, Section 560.

36. One method used by the United States government to regulate the export of controlled goods is through the DOC's post-shipment verification check, which entails, <u>inter alia</u>, DOC personnel visiting foreign entities to verify the use and location of goods exported to such foreign entities from the United States.

37. On or about February 2-3, 2015, the DOC conducted a post-shipment verification check at the Turkish Company. The post-shipment verification check revealed that on or about July 3, 2013, Global Metallurgy shipped approximately 330 pounds of the Cobalt Compound to the Turkish Company. KUYUMCU's name appears in multiple places on official documents regarding the July 3, 2013 export of the Cobalt Compound.

38. During the February 2015 post-shipment verification check, a DOC export control officer (the "ECO") met with the Co-Conspirator #1, who indicated that s/he

14

was owner of the Turkish Company. Co-Conspirator #1 explained that the Turkish Company was an import business that supplied various metals needed by mold producers. Co-Conspirator #1 also stated that the Turkish Company imported metal bars, rods and titanium that were used by medical industry customers to manufacture implants (for hip joints, knees, etc.). Co-Conspirator #1 stated that ninety percent of the Turkish Company's customers were located in Turkey. Co-Conspirator #1 further stated that the Turkish Company imported the majority of its metal products from Germany and Italy and a small amount from the United States. Co-Conspirator #1 stated that the Turkish Company had exported metal powders to Iran in the past, but before doing so, it had received approval from the Turkish Atom Energy Foundation.

39. When asked about the July 3, 2013 shipment of the Cobalt Compound, Co-Conspirator #1 stated, in sum and substance and in part, that it was used by companies to manufacture medical implants. Based on my training, experience and discussions with other law enforcement agents, I understand that the Cobalt Compound would not be used for medical implants.

40. Co-Conspirator #1 informed the ECO that the Turkish Company still had some of the Cobalt Compound in its warehouse stock, but the company had sold some of it. The ECO physically inspected the stock portion of the Cobalt Compound and also examined export documents provided by Co-Conspirator #1. These documents confirmed that the Turkish Company shipped 149.5 kilograms of the Cobalt Compound from Turkey to Iranian Company #1 on or about July 11, 2013. Notably, 149.5 kilograms is roughly equivalent to 330 pounds, which is the amount of Cobalt Compound that KUYUMCU shipped to the Turkish Company on or about July 3, 2013.

41. Documents provided by Co-Conspirator #1 to the ECO during the post-shipment verification check confirmed that KUYUMCU shipped the Cobalt Compound to Istanbul, Turkey on or about July 3, 2013 and that once the Cobalt Compound arrived in Istanbul, approximately 149.5 kilograms (330 pounds) of the substance was shipped on or about July 11, 2013 from the Turkish Company to Iranian Company #1.

42. I have caused to be conducted a search of OFAC records, which reveals that neither KUYUMCU nor Global Metallurgy has an OFAC license to export goods from the United States to Iran.

## CONCLUSION

43. Based upon the foregoing, I submit that there exists probable cause to believe that the defendant ERDAL KUYUMCU, together with others, did knowingly, intentionally, and willfully export, re-export, sell and supply, and attempt to export, re-export, sell and supply, goods, to wit: metallic powder composed of cobalt and nickel, from the United States to Iran, via Turkey, without first obtaining the required export control license from the Office of Foreign Assets Control, in violation of Title 50, United States Code, Sections 1701, 1702, and 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.206; and Title 18, United States Code, Sections 3551 et seq.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant ERDAL KUYUMCU may be dealt with according to law.

IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this Affidavit and the arrest warrant. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits via the Internet, and disseminate them to

other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this Affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

Dated: Brooklyn, New York
      February 18, 2016

                                  STEVEN JEFFERSON
                                  Special Agent
                                  Federal Bureau of Investigation

Sworn to before me this
18th day of February, 2016

THE HON[.]  S/ Pollak
UNITED ST[ATES]
EASTERN D[ISTRICT]

17