

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TAD/ABK
F. #2015R00760

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 14, 2017

<u>By ECF and Hand Delivery</u>

The Honorable Dora L. Irizarry
Chief United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Erdal Kuyumcu</u>
     <u>Docket No. 16-CR-308 (DLI)</u>

Dear Chief Judge Irizarry:

  In accordance with the Court's orders dated May 10, 2017, and July 6, 2017, the government respectfully submits this reply letter concerning facts related to sentencing that the government has proven by a preponderance of the evidence. This letter supplements the government's October 25, 2016 response to the defendant's objections to the PSR, the government's November 21, 2016 sentencing submission and its June 2, 2017 post-<u>Fatico</u> hearing letter.

  On June 21, 2017, the defendant submitted a post-<u>Fatico</u> hearing letter arguing for a downward departure or variance from the applicable Guidelines range of 46 to 57 months' imprisonment. (Def. <u>Fatico</u> Ltr. at 1-4, 7, 14-15).[1] The defendant seeks a below-Guidelines sentence based on the supposedly "aberrant" nature of his conduct. This argument is meritless. The government presented extensive evidence that the defendant knowingly caused the Cobalt Powder[2] to be re-exported from the United States to Iran twice,

---

[1]  This Guidelines range is premised on a base offense level of 26, pursuant to U.S.S.G. § 2M5.1(a)(1)(B), minus 3 points for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b). The Court repeatedly has expressed concern regarding "whether or not the defendant's positions aren't, in fact, a retreating from his acceptance of responsibility here." (<u>See</u> January 11, 2017 Tr. at 23, 32.)

[2]  Capitalized terms have the same meanings as those in the government's June 2, 2017 post-Fatico hearing letter.

in March 2013 and July 2013.  The defendant then sought to export more Cobalt Powder to Iran in August and October 2013.  He continued to solicit export opportunities to Iran in 2014.  In February 2016, he shipped over 23,000 kilograms of nickel alloy to his own company in Turkey, which he "suspected" might have gone to Iran.  He was correct.

The defendant also seeks a below-Guidelines sentence based on a policy disagreement with U.S.S.G. § 2M5.1(a), which imposes a base offense level of 26 if: (A) national security controls or controls relating to the proliferation of nuclear, biological or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism.  (See ECF No. 52 at 1.)  The Court should reject this argument.  The government presented extensive evidence at the Fatico hearing that: (1) the defendant knew the 2013 Cobalt Powder shipments went to Iran; (2) Iran is a state sponsor of terrorism and has been so designated for decades; and (3) the Cobalt Powder has military, missile, and nuclear applications.

In his June 21, 2017 letter, the defendant repeatedly misstates facts and makes claims flatly contradicted by documents the defendant himself authored or was able to read.  Because the government already has addressed the extensive evidence supporting the two contested sentencing issues, this reply letter focuses on the most egregious of the defendant's misrepresentations.

A.  The March 2013 and July 2013 Cobalt Powder Shipments Went to Iran

In spite of his sworn plea allocution that the "ultimate destination" of the July 2013 Cobalt Powder shipment was Iran, the defendant asserts that the government has submitted "very little evidence" that "the Cobalt Powder actually arrived in Iran."  (Def. Fatico Ltr. at 7.)  To the contrary, the government presented extensive evidence that the Cobalt Powder the defendant shipped to Era Metalurji in Turkey "actually arrived" in Iran.  Special Agent ("SA") Smith testified that an agent from the Department of Commerce ("DOC") conducted a post-shipment verification ("PSV") in Turkey concerning the July 2013 shipment.  (Tr. 114-15.)[3]  During the PSV, the DOC agent met with the defendant's co-conspirator, Mehmet Cingi, at Era Metalurji.  (Tr. 115-16.)  Cingi admitted to the DOC agent that the defendant's company, Global Metallurgy, had exported the Cobalt Powder from the United States to Turkey.  (GX 215.)  The DOC agent obtained documents from Cingi concerning the July 2013 shipment, including a shipping declaration showing that on July 11, 2013, Cingi's company, Era Metalurji, shipped 149.5 kilograms (half of the July 2013 shipment) of "Cobalt Salt" to Dana Industry Co. in Tehran, Iran.  (GX 84A; see also English translation, attached hereto as Exhibit 1.)

---

[3]   References to "Tr. __" are to the Fatico hearing transcript.  References to "GX __" are to exhibits introduced into evidence at the Fatico hearing.  Reference to "Ex. __" are to exhibits attached to this letter.

2

In his letter, the defendant asserts that the shipping declaration obtained from Cingi "is entirely in Turkish," and suggests the document does not show that the July 2013 shipment actually went to Iran. (Def. Fatico Ltr. at 7.) As a threshold matter, the names of the sender (Era Metalurji in Turkey) and the recipient (Dana Industry Co. in Tehran, Iran), are written in English. (GX 84A.) The date of the document—11.07.2013—is written in Arabic numbers and needs no translation. Moreover, the defendant speaks fluent Turkish. To suggest, as the defendant does, that the shipping declaration does not show that the July 2013 shipment went to Iran because parts of the shipping declaration are written in Turkish is disingenuous at best. To avoid any doubt, the government has obtained a translated version of the shipping declaration, which clearly shows that on July 11, 2013, Era Metalurji sent one container of 149.50 kilograms of "Cobalt Salt" to Dana Industry Co. in Tehran, Iran. (See Ex. 1 hereto.)

Testimony and evidence introduced at the Fatico hearing established that the March 2013 shipment and the July 2013 shipment were part of the same series of transactions, wherein a single U.S. supplier (Powder Alloy Corporation) sold the Cobalt Powder to the defendant, who shipped it to Era Metalurji in Turkey, for ultimate delivery to the Iranian "customer." Multiple emails—including emails forwarded to the defendant and from which he cut and pasted text—show that "Ardalan Dana" was the Iran-based procurement agent for the ultimate Iranian customer. (GX 7, 8, 9, 11, 12, 13, 13A, 14, 18, 19, 20, 21.) The defendant repeatedly referred to Dana and Iran interchangeably as "the neighbor" and "the neighbor country," which, by his own admission, were code for Iran. (GX 200 at 139.)

On April 16, 2013, by which time the Iranian Company would have received the March 2013 shipment,[4] the defendant emailed an Era Metalurji employee, asking: "have you heard anything from the neighbor? : )" (GX 72.) Five days later, on April 21, 2013, Cingi asked the defendant to find out whether a German company named EZM "is on the black list due to its relationship with the neighbor." (Tr. 113-14; GX 73.) On April 22, 2013, the defendant responded: "I don't have any idea where I could find the black list. I think [the German company] is wrong. I researched and I couldn't find anything like that." (GX 73.) In the same email, the defendant asked: "Do you have any information from the neighbor on the powder? I am eagerly awaiting[.]" (Id.)

As noted in the government's post-Fatico hearing letter, the email about a German company being on the "black list due to its relationship with the neighbor" confirms that "neighbor" means "Iran," and the "black list" likely refers to DOC's Entity List. See Docket No. 50 at 6.) In his letter, the defendant engages in verbal gymnastics to convince the Court that "neighbor" does not mean "Iran" and "black list" does not mean the DOC's Entity List:

---

[4] The March 2013 shipment was sent from the United States to Era Metaljuri in Istanbul, Turkey, on March 21, 2013. (GX 70; Tr. 110-12.)

3

> [T]he Government refers in its submission to an April 21, 2013 email between Mr. Kuyumcu and Cingi in which Cingi inquires whether a German company "is in the black list due to its relationship with the neighbor. The Government then posits, through pure surmise, that the "black list" refers to the DOC's Entity List and that, therefore the "neighbor" refers to Iran, without providing any evidence that the "black list" in fact referred to the DOC's Entity List, rather than a list compiled by another nation or within a private industry, etc.

(Def. Fatico Ltr. at 11.)

The defendant is fully aware of the "black list" to which he was referring. In advance of the Fatico hearing, the defense produced a series of emails to the government as potential exhibits. Two of the exhibits—marked as Defendant's Exhibits 21 and 21A—were emails between the defendant and a DOC employee. (See Ex. 2 hereto.) The first email, dated April 22, 2013, contains the defendant's request for information about a potential "Export Control Violation," wherein the defendant stated:

> Hello I have recently opened a company and doing business with Germany and Turkey. I am importing and exporting from those Nickel Cobalt alloys Stainless Steel, Titanium and Thermal Spray powders. Some exports inquiries are mostly used in Aerospace and Defense Industries. I would like to get a red flag list regarding this two countries. Is this possible?

(Ex. 2.)

The DOC employee responded by sending the defendant a link to DOC's "Lists of Parties of Concern," explaining: "through this link you can look at the Denied Persons List, BIS Entity List and others." (Id.)

Approximately thirteen minutes after receiving the link to the Entity List, the defendant emailed the DOC employee and explained he was "trying to find actually two companies: "Era Metalurji" and "EZM." (Id.) EZM was the name of the "German company" that might be on the "the black list due to its relationship to the neighbor," according to the defendant and Cingi. (GX 73.)[5]

---

[5] The government anticipates the defendant may argue that by asking DOC whether Era Metalurji and EZM were on the "red flag list," his April 21, 2013 email with Cingi about EZM being "on the USA black list due to its relationship to the neighbor" really meant that EZM might be on the "black list" due to its relationship with Turkey. Such an argument would be nonsensical because Cingi was based in Turkey. It would not make sense for Cingi to refer to Turkey as a "neighbor" because Turkey cannot be a neighbor to itself.

4

The defendant's communications with DOC clearly show that when he and Cingi discussed "the black list," they were referring to the DOC Entity List, not "a list compiled by another nation or within a private industry." (Def. Fatico Ltr. at 11.) As SA Smith testified at the Fatico hearing, one can end up on the DOC Entity List "by doing stuff that is contrary to U.S. policy, so trans-shipping items into Iran would get you on the entity list." (Tr. 114.) The defendant knew the March 2013 shipment was destined to Iran. He repeatedly referred to the end user as the "neighbor." In contemporaneous emails, he referred to the "neighbor" as a country that could get one "blacklisted" for doing business with it. The government has thus proven by a preponderance of the evidence that the defendant knew the March 2013 shipment was destined for Iran.

### B. The Cobalt Powder has Military, Missile and Nuclear Applications

On multiple occasions, the defendant violated the United States government's decades-long trade embargo with Iran. The trade embargo has been in place for good reason: Iran is the foremost state sponsor or terrorism, according to the State Department. (Tr. 73; GX 1, 2.) Dual-use items such as the Cobalt Powder pose a high risk of illegal use in military, missile and nuclear applications, given Iran's history of diverting such items to pursue its own military, missile and nuclear capabilities. (Tr. 31, 48.)

The illegal shipment of dual-use items to Iran—however seemingly innocuous those items may appear—poses grave national security risks. In 2006, dual-use electronics illegally transshipped from the United States to Iran, via the United Arab Emirates, were recovered from improvised explosive devices in the battlefields of Iraq and Afghanistan, where the United States had armed forces. (Tr. 79.) In addition, illegally-diverted dual-use items, including water filtration systems, have been used in Iranian nuclear facilities. (Id.) Because of the high risk posed by dual-use items shipped to Iran, export regulators evaluate exports to Iran not just for "potential use or probable" use, but the "worst potential use." (Id. at 48.)

The Sentencing Commission has acknowledged the seriousness of embargo violations involving Iran by assigning a base offense level of 26 to all export offenses that involve national security controls or involve a financial transaction with a country that supports international terrorism. U.S.S.G. § 2M5.1. The actual use of items exported to Iran, a state sponsor of international terrorism, is immaterial because "any violation" of the Iranian trade embargo "inherently" implicates the national security interests of the United States. See United States v. Sevilla, No. 04-CR-0171(JWD), 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) (applying a base offense level of 26 where a defendant shipped to Iran a machine used to test the tensile and compression strength of materials); see also United States v. Hanna, 661 F.3d 271, 294 (6th Cir. 2011) (defendant's shipment of telecommunications and navigation equipment to Iraq in violation of the IEEPA warranted a base offense level of 26 under U.S.S.G. § 2M5.1).

It is undisputed that the Cobalt Powder the defendant repeatedly shipped to Iran, via Turkey, has military and nuclear applications. Both the government's expert and the defendant's expert agreed that the Cobalt Powder is used as a coating for military jet engines. (Tr. 42, 44, 187.) The government's expert identified specific military jet engines on which the Cobalt Powder can be used, including the F-4 Phantom, a military bomber and fighter jet currently employed by the Iranian Air Force. The defendant's own correspondence shows that he knew the uses of the Cobalt Powder during the time he exported it to Iran via Turkey. In April 2013, the defendant represented to DOC that he was exporting nickel and cobalt alloys and thermal spray powders that "are mostly used in Aerospace and Defense Industries." (Ex. 2.) Moreover, the defendant presented no evidence disputing the government's expert's testimony that the Cobalt Powder can be used in nuclear applications, such as in industrial gas turbines used to generate power at nuclear facilities. (Id. at 47-48.)

The government also introduced strong circumstantial evidence that the Cobalt Powder involved in the July 2013 shipment—which the defendant admitted went to Iran—likely ended up at the Seventh of TIR Complex, an OFAC Specially Designated National involved in Iran's nuclear program. (Id. at 123-24; GX 210.) The day after Era Metalurji (in Turkey) shipped the Cobalt Powder to Dana Industries, in Tehran, Iran, Cingi received a letter-sized package from Isfahan Alloy Steel, an Iranian company whose address is the same as the Seventh of TIR Complex. (Tr. 122-23; GX 210.)

Apparently recognizing that the government has met its burden of proving that the Cobalt Powder had military and nuclear applications, the defendant now seeks to reframe the dispute as one over the *actual* use of the Cobalt Powder once it reached Iran. In that vein, the defendant now argues that the government failed establish that the Cobalt Powder "was in fact utilized" on a jet engine turbine or "a military jet turbine, let alone a military jet engine turbine with nuclear capabilities." (Def. Fatico Ltr. at 5-6.)

The Court should reject the defendant's attempt to recast his objections to the PSR. In his October 11, 2016 objections to the PSR, the defendant claimed the Cobalt Powder "has no nuclear or weapons use nor does it have a viable military use." (Def. PSR Ltr. at 4.) Based on that objection, the government stated that it would prove that the Cobalt Powder had "potential nuclear applications," that is, what the powder "can be used for." (Jan. 11, 2017 Tr. at 30-31.) That is exactly what the government established by a preponderance of the evidence at the Fatico hearing.

Based on the limited visibility into how illegally-diverted dual-use items are used in Iran (Fatico Tr. 71-72), the government does not claim to know exactly what Iran did with the Cobalt Powder once it received it. Strong circumstantial evidence supports the inference that the Cobalt Powder ended up at an OFAC entity involved in Iran's nuclear program. By illegally diverting the Cobalt Powder to Iran, the defendant bore the risk that it

6

would be put to the "worst possible" uses, including military, missile and nuclear applications.  The Court should, hold the defendant responsible for his choices and impose a sentence within the Guidelines range the Court determines appropriate.

          Respectfully submitted,

          BRIDGET M. ROHDE
          Acting United States Attorney

By:   /s/_____
       Tiana A. Demas
       Ameet B. Kabrawala
       Assistant U.S. Attorneys
       (718) 254-6116/6001

cc:   Patrick A. Mullin, Esq. (by email)
      Counsel to Defendant

      Mr. John Joseph Lanigan (by email)
      U.S. Probation Officer