UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES OF AMERICA,       :

                                -against-                      :      **MEMORANDUM AND ORDER**
                                                                   :           16-CR-308 (DLI)

ERDAL KUYUMCU,                              :

                                Defendant.       :
------------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

On June 14, 2016, Erdal Kuyumcu ("Defendant") pled guilty to an Information that charged him with a single count of conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1705(a), 1705(c). *See* Info., Dkt. Entry No. 17; June 14, 2016 Min. Entry. Specifically, Defendant admitted, under oath, that, in March 2013 ("March 2013 Shipment") and July 2013 ("July 2013 Shipment"), he "made two purchases of a cobalt alloy coating powder" from Powder Alloy Corporation ("PAC"), that were then sent to Iran via Istanbul. *See* June 14, 2016 Guilty Plea Tr. ("Plea Tr."), Dkt. Entry No. 33 at 56-57.

The parties appeared before the Court for sentencing on January 11, 2017. However, at that appearance, Defendant continued to dispute that the Government could prove certain facts contained in his Presentence Investigation Report ("PSR") by a preponderance of the evidence. *See* Jan. 11, 2017 Sent'g Tr. ("Jan. 2017 Tr."); *See also* Def. Oct. 11, 2016 PSR Objs. Ltr. ("PSR Objs."). In particular, Defendant challenged the Government's assertions that: (1) he knew the March 2013 Shipment of the metallic powder composed of Cobalt, Nickel, Chromium, Aluminum, and Yttrium[1] (the "Cobalt Powder") was destined for Iran; (2) the Cobalt Powder has military or nuclear applications; and (3) he attempted a third transaction that never was completed. *See* Jan. 2017 Tr. at 20-23. As a result of this dispute, the Court ordered a hearing pursuant to *United States*

---

[1] This chemical composition is abbreviated as "CoNiCrAlY."

*v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) (the "*Fatico* Hearing").

The *Fatico* Hearing was held on May 1 and 2, 2017. *See* May 1, 2017 Tr., Dkt. Entry No. 57; May 2, 2017 Tr., Dkt. Entry No. 58 (hereinafter both transcripts are cited together as "*Fatico* Hr'g Tr.").[2] At the *Fatico* Hearing, the Government presented testimony from David T. Flynn, the Program Director for Export Control Review and Compliance in the Office of Nonproliferation and Arms Control at the U.S. Department of Energy's National Nuclear Security Administration, as to the Cobalt Powder's applications. *See Fatico* Hr'g Tr. at 23-67. Without objection, Mr. Flynn was deemed an expert in United States export licensing policies, particularly as to the gas turbine industry. *Id*. at 29. The Government also presented testimony concerning the investigation that led to Defendant's arrest and prosecution from Special Agent Thomas F. Smith from the Office of Export Enforcement in the Bureau of Industry and Security ("BIS") at the U.S. Department of Commerce ("D.O.C."). *Id*. at 68-164. The Court finds the testimony of both Government witnesses not only credible, but compelling.

Defendant presented testimony from Douglas Maxwell who, without objection, was deemed an expert as to the Cobalt Powder's applications in the "gas turbine material and process industry." *Id*. at 171. While the Court finds the witness credible, the Court rejects the expert opinions of this witness to the extent they contradict those of the Government's expert, as discussed in more detail below. Defendant sought to introduce testimony from Fatih Donmez ("Donmez"), an attorney from the Republic of Turkey ("Turkey"), about an ongoing criminal investigation in that country concerning the diversion of a 2016 shipment of materials to Iran. *See Id*. at 8-19; *See also* discussion of 2016 transaction concerning Cannon Muskegon, *infra*. Defendant proffered that Donmez would testify that he had learned from Turkish prosecutors that Defendant was "not

---

[2] Dkt. Entry No. 57 contains pages 1-141. Dkt. Entry No. 58 contains pages 142-99.

considered to be either a subject or target of" that investigation. *Id*. at 10. The Court rejected this testimony after determining that there was no way to "determine the credibility or the truthfulness or the accuracy of the information that may have been imparted to him." *Id*. at 19.

After the *Fatico* Hearing, the Court accepted additional briefing from the parties. *See* Gov't Post-*Fatico* Hr'g Br. ("Gov't Br."), Dkt. Entry No. 50; Def. Post-*Fatico* Hr'g Br. ("Def. Br."), Dkt. Entry No. 52; Gov't Sent'g Supp. ("Gov't Resp."), Dkt. Entry No. 54.

For the reasons set forth below, based upon the witnesses' testimony, and upon due consideration of all the parties' submissions, the Court finds, by more than a preponderance of the evidence, that: (1) the Cobalt Powder has military and nuclear applications; (2) Defendant knew the March 2013 Shipment was intended for Iran; and (3) he knowingly and intentionally attempted to continue doing business with Iran after the July 2013 Shipment.

## DISCUSSION

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing Guidelines ("U.S.S.G.")] range." *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations omitted). This calculation provides "the starting point and initial benchmark." *Id*. However, the range provided by the U.S.S.G. is only advisory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The Court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50 (internal citations omitted). Rather, the Court also must assess and consider, among other things, "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

To this end, sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure[] that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting

*Wasman v. United States*, 468 U.S. 559, 564 (1984)); *See also United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013). This inquiry is "largely unlimited . . . as to the kind of information . . . consider[ed], or the source from which it may come." *Witte v. United States*, 515 U.S. 389, 398 (1995) (internal citations and quotation marks omitted). Indeed, the Court "may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment[,] and criminal activity resulting in an acquittal in determining sentence." *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Any conduct considered by the Court must be proven by a preponderance of the evidence. *See Witte*, 515 U.S. at 401. In this Circuit, courts may conduct this inquiry by way of a *Fatico* hearing, during which "the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *Fatico*, 603 F.2d at 1053).

## I. THE COBALT POWDER HAS MILITARY AND NUCLEAR APPLICATIONS

Defendant objects to the PSR, contending that the Cobalt Powder "is[,] in fact[,] used commercially to coat gas turbine engine blades, as it protects the blades from environmental deterioration due to oxidation, corrosion, and sulfidation. There is absolutely *no basis* in scientific fact for the Government's position that this spray has nuclear or weapon usage." PSR Objs. at 1 (emphasis added). The Court disagrees. Based upon the testimony and evidence adduced at the *Fatico* Hearing, the Court finds that the Cobalt Powder indeed does have military and nuclear applications.

According to the Government's expert, Mr. Flynn, the Cobalt Powder is "used as a spray protectant on the insides and various components of gas turbine engines." *Fatico* Hr'g Tr. at 32. A "gas turbine engine" is an internal combustion engine such as one would find in aircrafts, ships, or power plants. *Id*. As the explosions occur within the engine, hot air is generated, which, in turn, can combine with remnants of unspent fuel, thereby creating corrosive byproducts, such as sulfuric acid, that can degrade the metal. *Id*. at 35. When the Cobalt Powder is applied to various "hot sections" of a gas turbine engine, while the engine's performance is not altered, its "durability and longevity" is enhanced. *See Id*. at 34-35, 64-65. The Cobalt Powder can be applied at any time during the engine's life and can be reapplied as needed. *Id*. at 39.

Under the Export Administration Regulations, the Cobalt Powder is classified as "EAR99," which means it is "not explicitly described or mentioned in the commerce control list." *Id*. at 49. Materials classified as EAR99 may be "dual use" items, which are materials considered to have both civilian and military applications. *Id*. at 31, 78-79. The Government presented testimony concerning the threat posed by dual use items falling into the hands of the United States' enemies. For example, Special Agent Smith testified that electronic devices classified as EAR99, some of which are readily available for consumers in the United States, were used in making improvised explosive devices ("IEDs") in Iraq and Afghanistan. *Id*. at 79. Special Agent Smith also testified that domestic water filters classified as EAR99 were exported to Iran for use in their nuclear power plants. *Id*. The restrictions on exporting dual use products to Iran exist because the United States "has no way to know how the products are actually going to get used and who is actually using them." *Id*. at 71.

The Cobalt Powder at issue is a dual use item. Mr. Flynn explained that, in addition to more workaday applications, the Cobalt Powder could be used to extend the life of the General Electric

5

J79 engine used in the McDonnell Douglas F-4 Phantom jet. *See Id* at 42-43. The United States provided more than one hundred F-4 Phantoms to Iran before the Islamic Revolution in 1979. *Id*. at 44-45. Although the United States removed the mechanisms that would allow the aircraft to carry nuclear weapons when they were sold forty years ago, the jets can carry approximately 18,000 pounds of armament and were still used by the Iranian military in 2013. *Id*. at 44-45, 76-77; Gov't Ex.[3] 105 (photograph of a F-4 Phantom with Iranian military markings); *See also* Mark Thompson, *The Warplane That Will Not Die*, TIME (Dec. 4, 2014), http://time.com/3619184/the-warplane-that-will-not-die/; Douglas Ernst, *Iran Using U.S.-Made F-4 Phantom Jets to Bomb Islamic State*, WASHINGTON TIMES (Dec. 2, 2014), http://www.washingtontimes.com/news/2014/dec/2/iran-using-us-made-f-4-phantom-jets-bomb-islamic-s/. In addition to this military application, Mr. Flynn noted that, in facilities outside the United States, the Cobalt Powder could be used to protect gas turbine engines used to provide backup power for nuclear power plants. *See Fatico* Hr'g Tr. at 47.

In response, Defendant contends that the Government has not proven that the Cobalt Powder "has any military or nuclear use." Def. Br. at 4. This statement is flatly contradicted by Mr. Flynn's testimony discussed above and belied by Defendant's own expert. Although Mr. Maxwell claimed that the Cobalt Powder would not be the "best selection" for protecting military jet engines, he acknowledged that it could be used for that purpose. *Fatico* Hr'g Tr. at 186-87. Indeed, there is no discrepancy in the testimony proffered by the parties' experts as to this application of the Cobalt Powder. Both witnesses stated that the Cobalt Powder can be used in military jet engines, and Mr. Maxwell does not dispute that Iran possesses the type of jet engines

---

[3] Unless otherwise noted, the Court refers to the exhibits annexed to the Government's post-hearing submissions with the prefix "Gov't Ex.," and to those annexed to Defendant's post-hearing filings with the prefix "Def. Ex." throughout this Memorandum and Order.

that can be serviced by that coating. *See Id*. at 164-90. The core of Defendant's argument against the clear conclusion of this testimony rests on the fact that, in a world of potential chemical protectants, the Cobalt Powder is not the *best* choice. While that may be true, it does not negate the fact that the Cobalt Powder can be used to extend the service life of Iranian military aircraft or turbines used in power plants.

Accordingly, the Court finds that the Cobalt Powder has both military and nuclear applications.

## II. DEFENDANT WAS AWARE THAT THE MARCH 2013 SHIPMENT WAS DESTINED FOR IRAN

Defendant claims that it was only while arranging the July 2013 Shipment that he became aware that the Cobalt Powder was being sent to Iran. Plea Tr. at 57; *See also* Jan. 2017 Tr. at 20-21; PSR Objs. at 1 (alleging that the March 2013 Shipment ended up in Iran "unbeknownst to" Defendant). The Court rejects this argument. As evidenced by the documentary evidence produced at the *Fatico* Hearing, as well as Defendant's own admission as to what he meant by the term "neighbor," the Court finds by more than a preponderance of the evidence that Defendant knew the March 2013 Shipment was destined for Iran.[4]

In order to understand the significance of the e-mail communications produced by the Government, one must identify the coconspirators and the pattern of contact surrounding the shipments. The initial request for the Cobalt Powder came from an individual who identified himself or herself as Ardalan Dana ("Dana") on behalf of an Iranian company. Dana would contact Mehmet Cingi ("Cingi") or another employee of Era Metalurji ("ERA"), a company located in Istanbul, Turkey. ERA agents acted as intermediaries, getting messages to and from Defendant, the coconspirator inside the United States, who could place orders for the Cobalt Powder. It is

---

[4] The United States has deemed Iran a "State Sponsor of Terrorism" since 1984. *See* Gov't Ex. 1 at 300-01, Gov't Ex. 2 at 19-21; Gov't Ex. 3 at 196-97.

7

undisputed that, in the time leading up to the March 2013 Shipment, Defendant's only order for the Cobalt Powder was from ERA in the amount of 670 lbs. *See* Gov't Exs. 8, 20, 26, 29; *See also* Gov't Br. at 7; Def. Br. Defendant maintains that he thought the shipment was destined for Greece. *See* PSR Objs. at 2. As discussed below, the evidence adduced by the Government proves otherwise.

### A. Defendant Provided Different End Users for a Single Shipment

After receiving the request for Cobalt Powder from Cingi, Defendant sought price quotes from two commercial chemical companies in the United States: PAC and Sulzer Metco ("Sulzer"). *See* Gov't Ex. 5 (e-mail from a PAC representative), Gov't Exs. 26, 27 (e-mails from Sulzer representatives). However, when pressed by those companies to provide the name of the intended end user, Defendant gave two disparate responses.

In a February 22, 2013 e-mail exchange with a representative from Sulzer, Defendant indicated that he was sending the material to "Pyrogenesis," a company in Greece, for the purpose of repairing turbine blades in Saudi Arabia. *See* Gov't Exs. 26, 27. Two weeks later, a representative from PAC e-mailed Defendant and asked for the same end user information. *See* Gov't Ex. 45. Instead of repeating the information he provided to Sulzer, Defendant forwarded the message to Cingi, with the following message:

> Brother, can you tell me the name of a company? A friend company
> with a website that uses the material, would be great. I'd appreciate
> it if you could read the email below.

*See* Gov't Ex. 46. On March 11, 2013, Defendant e-mailed Cingi again, and pleaded for the name of an end user, writing, "[P]lease don't forget to give me the name of a company that *can* be used as the end user." Gov't Ex. 48 (emphasis added). Cingi responded and told Defendant to identify KMS Kardesler Machine Ltd. located in Istanbul, Turkey. *Id.*

8

In challenging this point, Defendant argues that both "Pyrogenisis and KMS Kardesler are . . . *actual* end users of the Cobalt Powder," so he had no reason to doubt the information Cingi provided. Def. Br. at 9 (emphasis added). This argument is unpersuasive and disingenuous at best. The e-mails from Cingi to Defendant placing the Cobalt Powder orders were on behalf of Dana, who represented an Iranian company. It is undisputed that Defendant knew transactions with Iran were prohibited. These requests for names of end users who *could* be provided to the Cobalt Powder providers were a clear attempt to prevent them from knowing that Iran was the actual intended destination.

### B. **"Neighbor" Was Code for Iran**

Defendant also disputes that the oft-repeated word "neighbor" was code for Iran. Throughout the correspondence produced at the *Fatico* Hearing, Defendant consistently used this word in connection with the Cobalt Powder transactions. Based upon the use of this word in context, it is clear that Defendant and his coconspirators used the term "neighbor" as code for Iran.

In a February 15, 2013 e-mail, Cingi informed Defendant that he was "flying out to the neighbor's for three days, Middle East." Gov't Ex. 4. Defendant acknowledged the message, and wished him luck "at the neighbor's." *Id*. Turkey is bounded by several countries that could be considered part of the "Middle East," including Armenia, Georgia, Iran, Iraq, and Syria. Any one of these could be the "neighbor" in this message. However, the particular country identified by the parties is clarified in later messages. In an April 21, 2013 e-mail, Cingi asked Defendant to confirm whether a certain German company was "on the black list due to its relationship with *the neighbor*[.]" *See* Gov't Ex. 73 (emphasis added). The next day, April 22, 2013, Defendant sent the following message to the D.O.C.:

> Hello I have recently opened a company and [am] doing business with Germany and Turkey. I am importing and exporting from

9

> those[,] Nickel Cobalt [A]lloys[,] Stainless Steel, Titanium, and Thermal Spray [P]owders. Some export[] inquiries are mostly used in Aerospace and Defense Industries. I would like to get a red flag list regarding th[ese] two countries. Is that possible?

Def. Ex. 21. A D.O.C. employee provided Defendant with a hyperlink to D.O.C.'s "Lists of Parties of Concern," advising that the link would give Defendant "the Denied Persons List, BIS Entity List and others." *Id*. Defendant then responded to the employee, explaining that he was trying to find ERA and a German company, "EZM." Def. Ex. 21A.

Defendant argues that there is no evidence that the "black list" referred to the D.O.C. Entity List, and that it could have been "a list compiled by another nation or within a private industry." Def. Br. at 11. Given the context and timing of the e-mail exchanges, the Court rejects this argument. Defendant's inquiry of the D.O.C. establishes that the "black list" in the April 21, 2013 e-mail (or "red flag list") refers to the D.O.C.'s Entity List. Of Turkey's neighbors, only transactions with two can result in a company being identified on that list: Iran and Syria. *See* 15 C.F.R. pt. 744.

Defendant also argues that, even if "neighbor" referred to Iran once, there is no indication that it consistently was used in that fashion. Def. Br. at 11. This argument also is rejected. The Court has not seen, and Defendant has not highlighted, any communication between himself and his coconspirators establishing that the word "neighbor" was used for any country other than Iran.

Furthermore, in addition to all of the above-cited circumstantial evidence linking use of the word "neighbor" to Iran, Defendant admitted that the word was code for Iran in his post-arrest interview. *See* Gov't Ex. 200 at 138-40. Although Defendant argues that he denied using any "code" and indicated that "neighbor" meant Greece, the Court is unpersuaded by that argument. Def. Br. at 10-11. Defendant's post-arrest interview makes clear that he knew that "neighbor" meant "Iran" in his correspondence:

> Q: Who are you referring to when you say neighbor?
>
> A: Neighbor as our region who um, whoever is a neighbor . . .
>
> Q: Yeah
>
> A: With Greece
>
> Q: In *this particular situation* is
>
> A: Yeah
>
> Q: You knew where it was going so in this in these emails in discussion about
>
> A: Yeah, yeah it was Iran.

*Id*. at 139 (emphasis added).

In the face of this evidence, Defendant points to a solicitation that Cingi forwarded to him on February 28, 2013. Def. Br. at 11; *See also* Gov't Ex. 32. That message, bearing the title, "Export [O]pportunity to [I]ran," is an advertisement for the website www.TurkiyeIran.org, and purports to help Turkish companies "establish customers / representative offices / dealerships [in Iran] via" the website. Gov't Ex. 32. Defendant argues that this solicitation, which refers clearly to Iran, proves that Defendant "did use the actual name 'Iran' in" his e-mail communications. Def. Br. at 11. This argument is faulty for two reasons. First, *Defendant* did not refer to Iran since the ad was sent to him. Indeed, Defendant did not have any control over the content of the message he received. Second, the context and substance of a solicitation is vastly different from Defendant's communications concerning the sale of the Cobalt Powder. In the former category, Defendant received a seemingly unsolicited advertisement. In the latter, he actively negotiated for the sale and shipment of the Cobalt Powder in contravention of United States law.

Based upon the foregoing, the Court finds, by a preponderance of the evidence, that Defendant knew the March 2013 Shipment was meant for Iran. Moreover, the Court rejects any

suggestion that Defendant ever was unaware that the July 2013 Shipment was destined for Iran. *See* Plea Tr. at 57; Def. Br. at 2. Defendant admits that, at some point, he became aware that the July 2013 Shipment was destined for Iran, but did nothing to stop it. However, he does not point to any particular event in that shipment process that was different from the March 2013 Shipment that made him aware it was destined for Iran. The tenor of his e-mails with Cingi, the use of the code "neighbor," and the company with which they were dealing were the same for both transactions. Defendant's claim defies credulity.

### C. The Shipments Actually Went to Iran

While Defendant concedes that his "criminal culpability . . . is not affected by whether" a shipment arrived in Iran, he nonetheless maintains that the Cobalt Powder never arrived in Iran and this fact requires that the Court apply the lower base offense level under U.S.S.G. § 2M5.1(a)(2). Def. Br. at 6-8. The Court disagrees. As an initial matter, Defendant pled guilty to a conspiracy and, as such, it is not necessary for the Court to find that the object crime actually was committed. Nonetheless, as discussed extensively in the Government's July 14, 2017 reply brief, the Government proved by a preponderance of the evidence that both the March 2013 and July 2013 Shipments actually went to Iran. *See* Gov't Resp. at 2-5. As discussed above, the Court has concluded that the Cobalt Powder has military and nuclear uses. It is undisputed that Iran is a designated state sponsor of terrorism. Accordingly, the higher base offense level of 26 under U.S.S.G. § 2M5.1(a)(1)(A) and (B) applies here.

## III. DEFENDANT ATTEMPTED TO CONTINUE DOING BUSINESS WITH IRAN

The final issue addressed at the *Fatico* Hearing was whether Defendant attempted to arrange a third shipment of Cobalt Powder to Iran. In an e-mail dated August 15, 2013, a representative from PAC wrote Defendant, stating that the company had another shipment "ready

to go." Gov't Ex. 92. In an August 21, 2013 e-mail to Cingi and other ERA agents, Defendant asked, "Are there any developments on the powder for the neighbor?" Gov't Ex. 91. In another e-mail from PAC dated October 28, 2013, the company's representative informed Defendant that they had "another 350 kgs (770 lbs)" of the Cobalt Powder ready to ship in approximately three weeks. Gov't Ex. 94.[5] Defendant forwarded this message to an agent at ERA and asked if they were "able to talk with the neighbor[.]" Gov't Ex. 95. The agent from ERA responded that they had communicated with "the neighbor" and that the neighbor "want[ed] at least a discount of 2-3 Euros per kilo." *Id*.

In addition to the e-mails above, which follow a pattern similar to that surrounding the March 2013 and July 2013 Shipments, the Government also submitted messages between Defendant and Burcu Altin ("Altin"), an ERA employee. Notably, in an exchange from February 2014, Defendant wrote to Altin, "If you have a chance, you should meet with Oguz, this guy is on good terms with the neighbor." Gov't Ex. 216 at 11. In response, Altin requests, "Introduce me to Oguz, send an email so we can meet." *Id*. By April 2014, Altin was communicating directly with Oguz about "the neighbor." *See Id*. at 9.

Beyond the documentary evidence outlined above, the Government also argued that Defendant's post-arrest interview indicates that he was doing business with Iran after the July 2013 Shipment. Specifically, when asked why he thought he had been arrested, Defendant stated that it was connected to his work for Cannon Muskegon and how alloys he exported from that company were being resold to Iran. Gov't Ex. 200 at 7. The documents submitted by the Government

---

[5] The PAC representative incorrectly identified PAC9330AM instead of PAC9950AM, the commercial name of PAC's iteration of the Cobalt Powder, in his October 28, 2013 message. Gov't Ex. 94. He corrected this mistake in an e-mail the following day. *See* Gov't Ex. 95.

establish that Defendant procured an alloy[6] from Cannon Muskego and exported this material to Global Metallurgy in Turkey, for sale to Epsilon, another Turkish company. *See generally,* Gov't Ex. 207. The documents provided by the freight forwarder indicate that, after it arrived in Turkey, the shipment was forwarded to Iran. *Id*.

In opposition to the evidence submitted concerning Defendant's conduct after the July 2013 Shipment, Defendant's only new argument is that "[t]he Government has failed to establish that [Defendant's 'suspicion'] indicates any intentional misconduct" on his part. Def. Br. at 12. Defendant contends he was not involved in later transactions "beyond the initial introduction" between Oguz and Altin. *Id*. Yet, the entire reason for introducing Oguz and Altin was Oguz's positive relationship with Iran, and the hope of fostering more future business with that nation. Gov't Ex. 216 at 11. Based upon the evidence submitted, Defendant had more than a "suspicion" that items he exported were being resold to Iran. He knew that providing material to Iran was the very purpose of the enterprise.

---

[6] In the shipping documents, the alloy is described as "100% Virgin Vacuum Inducted Refined Ingot" *See* Gov't Ex. 207.

## **CONCLUSION**

For the reasons stated above, the Court finds, by more than a preponderance of the evidence, that: (1) the Cobalt Powder has potential military and nuclear applications; (2) Defendant knew the March 2013 Shipment was destined for Iran, a country that for decades has supported international terrorism; and (3) he attempted to continue to do business with Iran after the July 2013 Shipment. These findings shall be considered in calculating the appropriate sentence guideline range and in considering the factors listed under 18 U.S.C. § 3553(a) to fashion a reasonable sentence.

SO ORDERED.

Dated: Brooklyn, New York
September 8, 2017

/s/
DORA L. IRIZARRY
Chief Judge